UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| WILLIAMSON COUNTY BOARD OF EDUCATION, ) ) ) Plaintiff/Counter-Defendant, ) ) v. ) ) C.K., as parent and next friend of C., ) a minor child, ) ) Defendant/Counter-Plaintiff. ) | No. 3:07-0826 Judge Echols |

## MEMORANDUM

Pending before the Court are Williamson County Board of Education's Motion to Stay (Docket Entry No. 1, Ex. A) and Defendant's Motion for a Preliminary Injunction (Docket Entry No. 7), to which the parties responded in opposition. The Court heard oral argument on the motions on October 4, 2007.

## I. FACTS AND PROCEDURAL HISTORY

Because the administrative record has not yet been filed, the Court relies on the facts as stated in the decision of the Administrative Law Judge ("ALJ") entered on June 15, 2007, following a due process hearing requested by C.K. The Court relies on such facts only for the purpose of ruling on the pending motions.

C. is currently a student in the eleventh grade at Independence High School in Williamson County, Tennessee. C. was first screened for special education services in 1999 when he was a third-grade student in the Nashville Metropolitan School District. At that time, C. scored high on

1

the Attention Deficit Hyperactivity Disorder ("ADHD") scale, but it was determined that C. could be successful in the regular classroom with major modifications. C. was referred to his physician for ADHD screening. What occurred in the two years thereafter is not apparent from the ALJ's decision.

In fifth grade, C. attended private school. His parents sought private testing to determine the reason C. had difficulty mastering necessary skills for successful completion of fifth grade.

In April 2002 C. was tested by Bowie Reading & Learning Center, Inc. C.'s intelligent quotient ("IQ") was found to be 143 on the WISC-III. The test revealed significant discrepancies in several areas of achievement including basic reading, written expression, and speed of progress. The Bowie report also noted a high index for ADHD. Reports stated: "By virtue of his higher cognitive scores and the difference between his academic achievement scores and WISC-III score, C. meets the State of Tennessee statutory criteria for Gifted/Learning Disabled in several areas."

Within months after the Bowie report was completed, C. began sixth grade at Heritage Middle School in the Williamson County School District ("WCS"). Both the Nashville Metro screening and the Bowie report were provided to WCS. The parents completed a student referral, which was given to the General Education Intervention Team ("GEIT"), together with permission for initial screening. As is customary, when a new student enrolls in WCS, the first step in the identification process is to try to address the student's needs through interventions in the general education curriculum. The initial screening consisted of direct observations by C.'s teachers. Based on these observations and the Bowie report, the GEIT team met in September 2002, at the beginning of C.'s seventh grade year and developed interventions to address C.'s needs. Concerns noted in the meeting minutes state in part, "Do we need to consider Sp. Ed. Services for gifted, ["Other

2

Health Impaired, Learning Disabled"]?" The team determined, however, that C. did not meet the eligibility requirements for special education.

At a second GEIT meeting in April 2003, the parents presented a list of concerns to WCS and asked for a scheduled meeting, at which Dr. Bowie would be present, to adopt an Individualized Educational Plan ("IEP") for C. In May 2003, at the parents' request, WCS agreed to reassess C.'s plan and consider the possibility of special education eligibility. WCS informed the parents that the first step toward attaining eligibility was to place a medical diagnosis on file. On May 20, 2003, the parents presented WCS with C.'s medical diagnosis of ADHD, for which C. was taking prescribed medication. The parents were interested in C.'s eligibility as Other Health Impaired, Learning Disabled, and/or Gifted. Dr. Martha Johnson explained to them the State of Tennessee's criteria in each of these areas and stated that C.'s test scores did not qualify him to be characterized as gifted.

In August 2004, the parents again provided WCS with a doctor's statement documenting C.'s diagnosis of "ADD-inattentive predominate" with recommended modifications of his school program "per IEP." At this time the team determined that the best course of action was to "continue to follow the regular seventh grade plan, which was still a 'Section 504 Plan.'" The Bowie report was by then three years old and WCS agreed that a re-evaluation of C. was appropriate. A psycho-educational evaluation was conducted by school personnel to determine if C. qualified for special education services, based on the medical diagnosis of ADHD (inattentive type) or as gifted. At a team meeting on August 30, 2004, the new evaluations were reviewed. The team decided that C. was not eligible for special education services because his needs were being met by the general education curriculum. The team concluded that his scores and performance in the classroom were sufficient evidence to support their determination that C. did not need special education services.

On February 28, 2005, a "504 meeting" was held to discuss C.'s upcoming entry into high school. At that meeting, the high school counselor expressed concern that C. did not have an IEP. The team decided that a Section 504 plan would be appropriate for C. to give accommodations to help him succeed in the eighth grade. These accommodations included extra time on homework and tests, daily interaction with instructors for organizational support, incentives for completing assignments, and weekly contact with parents as needed. The Section 504 plan was implemented for the rest of the eighth grade year.

C. started high school in August 2005. School staff asked the parents to attend a meeting to review C.'s Section 504 plan, but C.'s father responded he would like to see what C. could do on his own. By December, however, C.'s father was concerned about some of C.'s grades (which were average to above average) and requested a meeting. At the Section 504 meeting in December 2005, the team and C.'s father agreed to accommodations for C. which included: (1) having his agenda (a list of his assignments) signed daily by parents; (2) attending "after school tutoring" sessions, if needed; and (3) alerting his parents if he was struggling academically or behaviorally.

On January 11, 2006, C. was involved in an altercation with another student during a study hall. Following some verbal banter, C. slapped the other student with his hand twice and hit him in the face with a closed fist once. The students did not leave their seats, and the other student did not strike C. A teacher reported the incident. Based on WCS's policy of "zero tolerance" for fighting, an assistant principal disciplined C. by imposing twenty (20) days at the Alternative School.

Upon further investigation, WCS decided that a manifestation determination meeting was necessary because C. was a Section 504 student. On Friday, January 13, 2006, a team met with C.'s

4

father to determine if C.'s behavior was a manifestation of his ADHD, inattentive type. During the discussion a question arose whether C. was taking his prescribed medication. It was agreed that the school psychologist would contact C.'s physician to obtain more information and the team would reconvene the following week. At the subsequent meeting, the school psychologist reported that the doctor stated C.'s ADHD was based on inattention, not compulsivity or hyperactivity, and the doctor would not support the statement that, because C. did not take his medication, the fighting incident occurred. The school psychologist suggested adding coping mechanisms to C.'s Section 504 plan. C.'s father requested that quantifiable items be included in the Section 504 plan. The team agreed to consider future revisions, but the team felt C. was properly identified and served under his Section 504 plan. C. was present at the manifestation meeting. He admitted that his hitting behavior was not acceptable for a high school student. Based on all of this information, the team determined the altercation was not a manifestation of C.'s ADHD, inattentive type. C.'s parents asked for a disciplinary hearing, which is not part of Section 504 or the IDEA processes and such a meeting was held on January 23, 2006. C. was found guilty of fighting, but his punishment was reduced to twenty (20) "in-school" suspension days.

On March 8, 2006, C.'s parents again asked that C. be evaluated, that a functional behavior assessment be conducted, and that a behavior modification plan be developed. The team met on April 7, 2006 and agreed that, other than the isolated fighting incident, C. did not present any other behavioral problems. The team decided a behavior plan was not appropriate at that time.

Based on this record developed at a due process hearing requested by C.'s parents, the ALJ determined that WCS should have found C. eligible for special education services before his entrance into seventh grade. The ALJ entered an Order finding C. eligible for special education

5

services under the IDEA as "Other Health Impaired, Learning Disabled, and Intellectually Gifted." The ALJ ordered WCS to develop an appropriate IEP within sixty (60) days, including an appropriate program of positive behavior supports. The ALJ also ordered WCS to provide compensatory education and services to C. for one year in the form of tutoring before and/or after school for one to three hours per week, as determined by the IEP team. Finally, the ALJ ordered C.'s disciplinary record expunged of any reference to the fighting incident and any punishment imposed, but ruled the school attendance record did not need to be amended as to the days C.'s father kept him at home.

On August 3, 2007, the Williamson County Board of Education ("the Board") filed a Petition for Review of the ALJ's decision in the Chancery Court for Williamson County pursuant to Tenn. Code Ann. § 49-10-101 *et seq.,* the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1401 *et seq.* and Section 504 of the Rehabilitation Act of 1973. The Board also filed a Motion for Stay of the ALJ's decision. On August 10, 2007, C.K. removed the action to this Court pursuant to 28 U.S.C. §§ 1441(a) & 1446. On August 14, 2007, C.K. filed an Answer and Counterclaim, a Motion for Preliminary Injunction, and a response in opposition to the Board's Motion for Stay. On August 27, 2007, the Board filed its response in opposition to the Motion for Preliminary Injunction.

In the interim, an IEP meeting was held on August 15, 2007, to implement the ALJ's Order. The parties agreed that C. would undergo further testing and a subsequent IEP meeting would be held on September 12, 2007. Although C.'s testing was completed as planned, the Board cancelled the September 12 IEP meeting on advice of counsel. On September 11, the Board's attorneys sought, and later obtained, leave to file a supplemental response in opposition to C.K.'s motion for a preliminary injunction. The Board's supplemental response asserts that the Board is not required

6

to implement the ALJ's Order, citing as authority J.D. v. Manatee County School Bd., 340 F.Supp.2d 1316 (M.D. Fla. 2004).

## II. MOTION FOR STAY

The Board contends that its Motion for Stay became moot when C.K. removed the Board's action to federal court. The Court finds that the Motion for Stay is not moot. "[A] federal court takes the case on removal exactly as the case stood in state court and treats all pending motions as if filed in federal court." Young v. Cargill Juice North America, 2007 WL 438789 at *2 n.2 (M.D. Fla. Feb. 8, 2007) (citing 16 *Moore Federal Practice*, § 107.31[3]). Once removed, the Federal Rules of Civil Procedure govern the case.

The Board filed its Motion for Stay under Tennessee Code Annotated § 4-5-322(c), which provides:

> The filing of the petition for review does not itself stay enforcement of the agency decision. The agency may grant, or the reviewing court may order, a stay upon appropriate terms, but if it is shown to the satisfaction of the reviewing court, in a hearing that shall be held within ten (10) days of a request for hearing by either party, that any party or the public at large may suffer injury by reason of the granting of a stay, then no stay shall be granted until a good and sufficient bond, in an amount fixed and approved by the court, shall be given by the petitioner conditioned to indemnify the other persons who might be so injured and if no bond amount is sufficient, the stay shall be denied. The reviewing court shall not consider a stay unless notice has been given to the attorney general and reporter; nor shall the reviewing court consider a stay unless the petitioner has previously sought a stay from the agency or demonstrates that an agency ruling on a stay application cannot be obtained within a reasonable time.

The record before the Court does not reveal whether the Board provided notice to the attorney general and reporter or whether the Board first sought a stay before the ALJ. Assuming these statutory requirements were met, the Court finds that the Board's Motion for Stay, whether

7

brought under § 4-5-322(c) or reformulated under federal law, should be denied on the merits for the reasons stated below.

The Court observes that the position taken by the Board before this Court–that its own Motion for Stay is moot and that the Board had no obligation to implement the ALJ's decision within sixty (60) days as ordered by the ALJ–effectively granted the Board a stay of the ALJ's decision by its own hand. The Board's refusal to implement the ALJ's decision as ordered fails to comport with state or federal law.

### III. MOTION FOR PRELIMINARY INJUNCTION

C.K. seeks a preliminary injunction to enforce the ALJ's decision pending final resolution of this case. At issue is the "stay-put" provision of the IDEA, which states:

> (j) Maintenance of current educational placement
>
> Except as provided in subsection (k)(4) of this section, during the pendency of any proceedings conducted pursuant to this section, unless the State or local educational agency and the parents otherwise agree, the child shall remain in the then-current educational placement of the child, or, if applying for initial admission to a public school, shall, with the consent of the parents, be placed in the public school program until all such proceedings have been completed.

20 U.S.C. § 1415(j). The applicable federal regulation stated[2]:

> (a) Except as provided in § 300.526, during the pendency of any administrative or judicial proceeding regarding a complaint under § 300.507, unless the State or local agency and the parents of the child agree otherwise, the child involved in the complaint must remain in his or her current educational placement.
>
> . . . .
>
> (c) If the decision of a hearing officer in a due process hearing conducted by the SEA or a State review official in an administrative appeal agrees with the child's parents that a change of placement is appropriate, that placement must be treated as

---

[2] The current regulation, using similar language, is now found at 34 C.F.R. § 300.518.

>an agreement between the State or local agency and the parents for purposes of paragraph (a) of this section.

34 C.F.R. § 300.514.

The "stay-put" provision commands that "during the pendency of any proceedings to challenge a change in a child's IEP, the child shall remain in the current educational placement unless the school authorities and parents agree otherwise." Tennessee Dept. of Mental Health and Mental Retardation v. Paul B., 88 F.3d 1466, 1472 (6th Cir. 1996). The Supreme Court has described the statute's language as "unequivocal," in that it states plainly that "the child shall remain in the then current educational placement." Honig v. Doe, 484 U.S. 305, 323 (1988). By adopting this statute, "Congress very much meant to strip schools of the *unilateral* authority they had traditionally employed to exclude disabled students . . . from school." Id. (emphasis in original).

The provision represents Congress' policy choice that all disabled children, regardless of whether their cases are meritorious or not, "are to remain in their current educational placement until the dispute with regard to their placement is ultimately resolved. Once a court ascertains the student's current educational placement, the [student is] entitled to an order without satisfaction of the usual prerequisites to injunctive relief." Drinker by Drinker v. Colonial School Dist., 78 F.3d 859, 864 (3rd Cir. 1996). See also Doe v. Board of Educ. of Elyria City Schools, 1998 WL 344061, *3 (6th Cir. 1998) ("The "stay-put" provision mandates that the disabled child remain in his current educational placement, unless the education agency and the child's parents agree otherwise."). Thus, section 1415(j) functions as an automatic preliminary injunction in favor of the parents and child. Drinker by Drinker, 78 F.3d at 864; Wagner v. Board of Educ. of Montgomery County, 335 F.3d 297, 301 (4th Cir. 2003); Johnson ex rel. Johnson v. Special Educ. Hr'g Office, 287 F.3d 1176 (9th Cir. 2002); Rodiriecus L. v. Waukegan School Dist. No. 60, 90 F.3d 249, 253 (7th Cir. 1996).

Contrary to the Board's contention here, the parent need not satisfy the four factors--likelihood of success on the merits, a showing of irreparable harm, balancing of the harms, and the public interest–ordinarily required to obtain a preliminary injunction.  See Baker v. Adams County/Ohio Valley School Bd., 310 F.3d 927, 928(6th Cir. 2002).

Courts have been called upon to decide how § 1415(j) and the regulation apply when the parents, not the school, advocate a change in the child's placement and ultimately succeed before an administrative law judge, administrative appellate panel, or a court.   In School Committee of Town of Burlington, Mass. v. Department of Educ. of Mass., 471 U.S. 359, 372 (1985) (emphasis in original), the Supreme Court noted that this statute[3] "calls for agreement by *either* the *State or* the *local educational agency.*"  The Supreme Court observed in that case that the local educational agency's agreement with the parents' position "would seem to constitute agreement by the State to the change of placement."  Id.

Since Burlington, many courts have held that an administrative or court ruling in the parents' favor constitutes an agreement between the parents and the State or local educational agency, and that the decision in favor of the parents becomes the "current educational placement" of the child pending final resolution of the case.  See e.g.  Susquenita School Dist. v. Raelee S., 96 F.3d 78, 84-85 (3rd Cir. 1996) ("We cannot agree that [the "stay-put" provision] should be used here as a weapon by the Susquenita School District to force parents to maintain a child in a public school placement which the state appeals panel has held inappropriate."); Board of Educ. of Pawling Central School Dist. v. Schutz, 290 F.3d 476, 484 (2nd Cir. 2002) (holding once parents' challenge succeeds, the school district's consent to the placement ordered is implied by law); Escambia County Bd. of Educ.

---

[3]Previously codified at 20 U.S.C. § 1415(e)(3).

10

v. Benton, 358 F.Supp.2d 1112, 1122-1124 (S.D. Ala. 2005) ("Given this groundswell of authority . . . the Court finds that the Administrative Decision effectively constitutes an agreement between the State of Alabama and Benton's parents as to Benton's current placement for purposes of this litigation."); West Platte R-II School Dist. v. Wilson, 2004 WL 1895136 at *2 (W.D. Mo. 2004) (holding panel decision constituted agreement between State of Missouri and child's parents and represented child's current educational placement); Matthew K. v. Parkland School Dist., 1998 WL 84009 at *5 (E.D. Pa. 1998) (holding local educational agency's decision, through hearing officer, constituted child's current educational placement).

In this case, the ALJ's decision favors C. and his parents. Under the above-cited authorities, the ALJ's decision constitutes an agreement between the parents of the child and the State or the local educational agency. The relief ordered by the ALJ becomes C.'s current educational placement pending final disposition of the Board's appeal in this Court.

The Board contends, however, that the "stay-put" provision does not apply in this case where the Board did not at any time find C. to be eligible for special education services under the IDEA and no IEP was ever completed and implemented. The Board correctly points out that the cases cited by C.K. and cited by the Court above involved situations in which initial IEPs had been implemented and subsequent IEPs were at issue.

The Board offers as a case on point J.D. v. Manatee County School Bd., 340 F.Supp.2d at 1317. In that case, an ALJ ruled that the student was a child with a disability under the IDEA and eligible for IDEA protections. Id. The ALJ ordered the school board to develop an IEP for the student, and the school board appealed that decision. Id. In federal court, the parent sought a preliminary injunction to enforce the favorable order of the ALJ. Id. The school board opposed the

11

preliminary injunction on the ground that, absent an ALJ decision on "placement," there was no "current educational placement" that would activate the "stay-put" provision of the IDEA, and the district court agreed. Id. at 1319.

The court distinguished cases like those cited by C.K. here, noting that the "stay-put provision applies only to services included in a child's IEP[,]" citing Cordrey v. Euckert, 917 F.2d 1460, 1468 (6th Cir. 1990). Further, the court reasoned, in order to qualify for stay-put protection, the parent "'must identify a detrimental change in the elements of an educational program[,]'" citing Tennessee Dept. of Mental Health and Mental Retardation v. Paul B., 88 F.3d 1466, 1474 (6th Cir. 1996). 340 F.Supp.2d at 1319. The court concluded that the parent had not identified a change in the child's educational program qualifying for stay-put protection because there was no program in place. Id. Finally, the court ruled, "[a]bsent a decision by the ALJ that a change in placement is appropriate," the plain language of the IDEA and its regulations required the child to remain in his then-current educational placement, which was the regular classroom. Id.

There are several reasons why Manatee County School Bd. does not control here. One obvious reason is that the case was decided by a Florida district court and is not binding precedent on this Court. But more importantly, the fundamental premise of Manatee County School Bd. is not present here. In that case, the ALJ had not made any ruling concerning an appropriate placement for the child. The ALJ held only that the child was eligible for special education services and ordered the school district to develop an IEP. In this case, the ALJ's decision extended further than a mere finding of eligibility for special education services and a simple order directing the Board to develop an IEP. In this case, the ALJ recognized that C. *had a prior placement* in a Section 504 plan that was not meeting his needs. The ALJ specifically held that C. should have been provided

12

special education services beginning at the seventh grade, but he was not. The ALJ ordered the Board to do more than complete an IEP. The ALJ ordered the Board to include Dr. Stewart, who apparently testified as an expert for C. at the due process hearing, as a member of the IEP team. The ALJ further ordered the Board to provide one year of compensatory education. These elements of the ALJ's decision amounted to a "placement" of C. and distinguish this case from Manatee County School Bd.

Additionally, the Court concludes that the Florida district court extracted out of context certain statements from the two Sixth Circuit cases it cited, and inappropriately used those statements to reach a result. In Cordrey, 917 F.2d at 1468, the student had an IEP and the question presented was whether an additional program should be added to the IEP. Id. at 1463. Thus, at the outset, Cordrey is not like Manatee County School Bd. The appeals court stated in Cordrey as a general proposition of law that "[t]he stay-put provision applies only to services included in the child's IEP." Id. at 1468. The court meant that, where a child has an IEP and the stay-put provision applies, the child is entitled to receive those services included in the IEP that is the current educational placement, pending resolution of the disputed case. Yet, the Florida court relied on the statement to hold that, because J.D. had never been found eligible for special education and never had been provided an IEP, the stay-put provision could not apply to him.

The Florida court cited Tennessee Dept. of Mental Health and Mental Retardation, 88 F.3d at 1474, for the proposition that the parent was required to identify a detrimental change in the elements of an educational program to fall within the "stay-put" provision. In that Sixth Circuit case, the parent argued that he was forced to make a unilateral placement for his son, but he did not claim that his son's special educational needs would not have been met under his current IEP. Id.

13

The Florida court did not explain why J.D.'s parent would have to show a detrimental change in the elements of an educational program where J.D. had never been provided with an IEP at all. Consequently, the Court is not convinced that Manatee County School Bd. is well-reasoned, particularly when its use of Sixth Circuit cases is suspect.

The Court also rejects Manatee County School Bd. for another critical reason. The IDEA does not define what the Act means when it refers to the child's "then current educational placement." The Court should not accept Manatee County School Bd.'s definition of this term because the Sixth Circuit has already given this Court guidance in how the term is to be understood:

> the term "then current educational placement" must be accorded its plain meaning. Because the term connotes preservation of the status quo, it refers to the operative placement actually functioning at the time the dispute first arises. If an IEP has been implemented, then that program's placement will be the one subject to the stayput provision. <u>And where, as here, the dispute arises before any IEP has been implemented, the "current educational placement" will be the operative placement under which the child is actually receiving instruction at the time the dispute arises.</u>

Thomas v. Cincinnati Bd. of Educ., 918 F.2d 618, 625-626 (6th Cir. 1990) (emphasis added). C.'s operative placement actually functioning at the time this dispute first arose was C.'s high school Section 504 plan, which the ALJ determined was inappropriate to meet his needs for special education. In Thomas the Sixth Circuit did not consider whether a subsequent ALJ decision in the parents' favor could constitute an agreement under § 1415(j), shifting the "current educational placement" to the placement as ordered by the ALJ. See Board of Educ. of Montgomery County v. Brett Y., 959 F.Supp. 705, (D. Maryland 1997) (granting preliminary injunction where ruling in parents' favor constituted agreement and distinguishing Thomas because it did not decide a similar question). Nor does it appear that the Sixth Circuit has had an opportunity to consider this question since Thomas.

14

The federal regulation is clear: "If the decision of a hearing officer in a due process hearing conducted by the SEA or a State review official in an administrative appeal agrees with the child's parents that a change of placement is appropriate, that placement must be treated as an agreement between the State or local agency and the parents for purposes of paragraph (a) of this section." 34 C.F.R. § 300.514(c). In accordance with this regulation and § 1415(j), and following Susquenita School Dist., 96 F.3d at 84-85, Board of Educ. of Pawling Central School Dist., 290 F.3d at 484, Escambia County Bd. of Educ., 358 F.Supp.2d at 1122-1124, West Platte R-II School Dist., 2004 WL 1895136 at *2, and Matthew K., 1998 WL 84009 at *5, the Court holds that the ALJ's decision in favor of C.K. on behalf of C., constituted an agreement to change the current educational placement of C. to that ordered by the ALJ. Consequently, C.K. is entitled to an automatic injunction under 20 U.S.C. § 1415(j) pending final disposition of this case.

## IV. CONCLUSION

For all of the reasons stated, Williamson County Board of Education's Motion to Stay (Docket Entry No. 1, Ex. A) will be denied. Defendant's Motion for a Preliminary Injunction (Docket Entry No. 7) will be granted.

An appropriate Order shall be entered.

                                              _____
                                              ROBERT L. ECHOLS
                                              UNITED STATES DISTRICT JUDGE