# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **WILLIAMSON COUNTY BOARD** | ) | |
| **OF EDUCATION,** | ) | |
| | ) | |
| **Plaintiff/Counter-Defendant,** | ) | |
| | ) | **No. 3:07-0826** |
| **v.** | ) | **Judge Echols** |
| | ) | |
| **C.K., as parent and next friend of C.,** | ) | |
| **a minor child,** | ) | |
| | ) | |
| | ) | |
| **Defendant/Counter-Plaintiff.** | ) | |

## MEMORANDUM

Plaintiff/Counter-Defendant Williamson County Board of Education (the "Board") initially filed this action in the Chancery Court for Williamson County appealing the decision of the Administrative Law Judge ("ALJ") entered on June 15, 2007, following a due process hearing. Defendant/Counter-Plaintiff C.K., as parent and next friend of his minor child, C., removed the action to this Court pursuant to 28 U.S.C. § 1441(a) because the action arises under the laws of the United States, specifically, the Individuals with Disabilities Education Act, 20 U.S.C. § 1415(i)(2)(A) & (i)(3)(A), and its implementing regulations, and the Rehabilitation Act, 29 U.S.C. 794(a).

The Court held a bench trial on November 12, 2008. The parties did not present any witnesses; instead, they presented oral arguments in reliance on the administrative record, cited hereafter as "AR." The administrative record consists of seven volumes filed in hard copy on December 7, 2007 (Docket Entry No. 31); the Individual Education Program ("IEP") of C., written

1

on October 24, 2007, after this suit began and submitted to the Court by the Board under seal[1] (Docket Entry Nos. 39, Exhibit 1 & 47, Order); and collective Exhibit 2 in hard copy, which consists of an additional volume of documents that were entered into evidence during the hearing before the ALJ, but inadvertently omitted from inclusion in the seven volume administrative record filed in this Court. The parties subsequently filed collective Exhibit 2 as part of the administrative record by joint stipulation of the parties. (Docket Entry Nos. 51 & 53.) Exhibit 2 will be cited as "SAR," short for Supplemental Administrative Record.

On June 23, 2008, C.K. filed a Motion for Judgment on the Pleadings (Docket Entry No. 32), which the Court summarily denied in anticipation of entering this opinion following the bench trial. (Docket Entry No. 49.) The Court stated in the June 23 Order that it would consider the legal memoranda submitted by the parties in support of, and in opposition to, the Motion for Judgment on the Pleadings in ruling on the case, and the Court has considered those filings. (Id.) Additionally, following the bench trial, the Board submitted Proposed Findings of Fact and Conclusions of Law and Post-Trial Brief (Docket Entry No. 56), and C.K. submitted Defendant/Counter-Plaintiff's Proposed Findings of Facts and Conclusions of Law (Docket Entry No. 54). The Court has considered these filings as well, and to the extent the findings of fact and conclusions of law proposed by the parties are inconsistent with or contradict the facts as stated by the Court, the proposed findings of fact and conclusions of law are overruled.

------

[1] The Court held in abeyance whether the IEP should be included as part of the record before this Court for review. (Docket Entry No. 49.) The Court now expressly rules that the IEP is properly before the Court for consideration because the statute permits the court to "hear additional evidence at the request of a party[.]" 20 U.S.C. § 1415(i)(2)(C)(ii). The IEP was submitted primarily to assure the Court that the Board complied with the decision of the ALJ that the IEP be written, as enforced by this Court's preliminary injunction. (Docket Entry Nos. 21 & 22, Memorandum and Order.) The substance of the IEP is not germane to the issues resolved in this opinion.

# I.  STANDARD OF REVIEW

"The standard of review for cases under the Individuals with Disabilities Education Act is distinctive." Kings Local Sch. Dist. v. Zelazny, 325 F.3d 724, 728 (6th Cir. 2003). This Court must review *de novo* the record of the due process hearing, but the Court must give due weight to the findings resulting from the state administrative proceedings. Id. This is called "modified de novo review." Id.

The amount of weight the Court must give to an administrative finding depends on whether the finding is based on educational expertise. Id. (citing McLaughlin v. Holt Public Sch. Bd. of Educ., 320 F.3d 663, 669 (6th Cir. 2003)). More weight is due an agency's determinations on matters for which educational expertise is relevant. Id. The Court should give less weight to an agency's determinations on matters for which educational expertise is not relevant because the Court is just as well-suited to evaluate the situation. Id. The Court is required to make findings of fact based on a preponderance of the evidence contained in the complete record, giving some deference to the findings of fact in the administrative proceedings. Knable v. Bexley City Sch. Dist., 238 F.3d 755, 764 (6th Cir. 2001). The preponderance of the evidence standard is by no means an invitation to this Court to substitute its own notions of sound educational policy for those of the school authorities under review. Burilovich v. Board of Educ., 208 F.3d 560, 566 (6th Cir. 2000). "Indeed, federal courts are generalists with no expertise in the educational needs of handicapped children and will benefit from the factfinding of a state agency, which is presumed to have expertise in the field." Id. The Court may set aside administrative findings "only if the evidence before the court is more likely than not to preclude the administrative decision from being justified based on the agency's presumed educational expertise, a fair estimate of the worth of the testimony, or both." Id. at 567.

3

The inquiry under the IDEA is twofold. "First, a court conducts an examination of prior proceedings for procedural compliance, and then an examination of whether the student's substantive rights to services under the IDEA were violated." N.L. v. Knox County Sch., 315 F.3d 688, 693 (6th Cir. 2003).

## II. FINDINGS OF FACT

C. was born on April 12, 1991. (SAR 1.) He is currently a senior at Independence High School in the Williamson County School System.

C. was first screened for special education services in 1999 when he was a third-grade student in the Metropolitan Nashville School District. (SAR 2-4.) At that time, C. scored high on the scale for Attention Deficit Hyperactivity Disorder ("ADHD") and C. was referred to his physician for further evaluation for ADHD. (SAR 5-7.) It was determined that C. could be successful in the regular classroom with major modifications, and he was not certified for special education services.

In fifth grade, C. attended private school, but he had difficulty mastering necessary skills for successful completion of fifth grade, and the school suggested not promoting him to sixth grade. C.'s parents sought to better understand their son's abilities and educational needs. In April 2002 C.'s parents requested a psychoeducational evaluation of C. from the Bowie Reading & Learning Center, Inc., in Nashville at their own expense. (SAR 20-59.) The Bowie Center was developed by Robert L. Bowie, Ed.D., who worked many years in the Metropolitan Nashville School System and is now deceased, Timothy D. White, Ph.D, director of school psychologists for the Metropolitan Nashville School System, and Deborah W. Higdon, M.Ed. (AR Vol. IV 346-347, 362-363.) Dr. White worked at the federal and state levels to help write the current guidelines for learning

4

disability.  (Id. at 347.)  Dr. Bowie and Ms. Higdon specialized in reading and learning, but the Court is not clear which individual specialized in which area.  (AR Vol. IV 362.)

The evaluation of C. at the Bowie Center included written and verbal interviews with C.'s parents, a written interview with C.'s teacher, and a verbal interview with C.  These interviews explored subjects such as creativity, oral language expression, attention span, independence, organization, study habits, self-control and peer relations, among others.  The evaluation also included direct behavioral observation of C. by Dr. Bowie, Dr. White, and Ms. Higdon.  Certain tests were administered to C., including the Woodcock-Johnson III Tests of Cognitive Abilities (WJ-III), Wechsler Intelligence Scale for Children - 3rd Edition (WISC-III), and Woodcock-Johnson III Tests of Achievement (WJ-III).  Following the evaluation, a lengthy and comprehensive report was prepared explaining the results of the interviews, observations, and tests, known as "the Bowie report."

The evaluators concluded that C.'s overall cognitive abilities, as measured by the WISC-III, are in the very superior range, with a full-scale IQ of 143.  Such a score exceeded ninety-nine percent (99%) of the students C.'s age.  (SAR 27.)  As measured by the WJ-III, C.'s overall cognitive abilities are in the high average range.  (SAR 37.)  C.'s academic achievement was in the average range or higher in the areas tested, but significantly lower than expected based on his level of intellectual functioning.  He achieved his best performance in math calculation skills and his poorest performance in basic writing skills.  His writing suffered from poor spelling, punctuation, word choice and sentence structure, and his written expression abilities were well below expectations based on his oral language abilities.  C. was able to read more quickly than most

5

students his age, but his reading comprehension abilities appeared to be inconsistent. He performed much better on informal reading tasks than on standardized reading tests.

The Bowie report concluded: "By virtue of his higher cognitive scores and the difference between his academic achievement scores and his WISC-III scores, [C.] meets State of Tennessee criteria for Gifted/Learning Disabled in several areas."[2] (SAR 37.) The Bowie report described C. as a "gifted underachiever with an attention disorder." The report explained that such children may have "inordinate difficulty completing assignments, tuning in to salient information, and performing consistently on examinations and written reports." (SAR 38 (internal quotes omitted).) The report further stated:

> Gifted children with ADHD may prefer concepts and theories to details. They are similar to other children with attention deficits in the tendency to be "impulsive, confusingly inconsistent, distractible, and poor at monitoring themselves." Gifted children with attention deficits may also be defiant, manipulative and able to rationalize underachievement. Levine suggests that gifted children with attention deficits be treated in much the same way as non-gifted children with attention deficits. Additionally, inappropriate behaviors should be dealt with "directly through confrontation, counseling, and behavior modification." Levine adds that the gifted child with attention deficits may require "substantial activity or a highly motivating, intense experience to remain sufficiently alert and satisfied."

(SAR 38 (quoted authority omitted)). The Bowie report concluded with approximately five pages of recommendations covering attention/behavior, writing, spelling, reading comprehension, listening

---

[2] Dr. Martha Johnson, school psychologist at Heritage Middle School in the Williamson County School System, testified that one of her concerns with Dr. Bowie's statement was that there was no reference to processing deficits, which are required in the diagnosis of a learning disability. (AR Vol. V 564.) She also testified that the Bowie report did not provide measures of creativity and academic performance, and the achievement scores in the report were not high enough to meet State of Tennessee standards. (Id. at 569.) The four definitional components of "intellectually gifted" are creativity, academic performance in the classroom, academic achievement on achievement tests, and intellectual ability on intelligence tests. (Id. at 571, 600; Docket Entry No. 56-1, "Documentation –Component Gifted Assessment.")

6

comprehension, study skills, and school accommodations/modifications. (SAR 38-43.) The latter category consisted of the statement: "Because of [C.'s] unique needs, we would like to meet with his educational team at school to develop an appropriate plan for [C.]." The report also included six pages devoted to classroom modifications and strategies for children with ADHD.

Upon considering the Bowie report, C.'s parents decided to move to a different school district to try to find an appropriate educational environment for their son. After researching the subject, they settled on the Williamson County School System. (AR Vol. V 467-468.) They moved to Thompson Station, Williamson County, Tennessee, and enrolled C. in sixth grade at Heritage Middle School starting in the Fall of 2002. (SAR 65.) On the "New student Processing Form," C.'s mother was asked, "Special Services received?" She responded: "Special Ed. (ADHD-Gifted) Ms. Gatto has paperwork." Under "Health or medication issues?" C.'s mother wrote, "Focalin for ADHD." Under "Social or emotional issues?" C.'s mother wrote: "No problem if on meds/if meds missed can be somewhat irrational." (SAR 66.)

C.K. testified that C. usually started a new school year in the same way; the first couple of weeks would start out well because C. was in a good mood, he completed his homework and teachers would respond. Thereafter, C.'s performance would deteriorate and C.'s parents would visit the school every two or three weeks. (AR Vol. V 469.) Prior to C.'s sixth grade year, C.K. provided the school with the Bowie report immediately because school officials told him they had a very specific process to follow concerning special education. The school principal, Ms. Pulliam, told C.K. that C. needed a GEIT plan.[3] (AR Vol. V 470.) When a new student enrolls in the

_____

[3] GEIT refers to "General Education Intervention and Monitoring Plan."

7

Williamson County School System, school officials customarily first try to address any student needs through interventions in the general education curriculum. (AR Vol. VI 645-647.)

C.K. signed a "Permission for Initial Screening" form given to him by the school counselor, Kay Farris, to permit the school to undertake classroom observation and attention/behavior screening.[4] (AR Vol. II 180.) Along with the permission form, a "Student Referral" form was also completed, showing that C.K. was making the referral and checking areas of concern as "Attention/Organization" and "High Achievement." (AR Vol. II 179.) At the bottom of the form, Ms. Farris indicated that C. had been evaluated by an outside agency, the Bowie Center, in March and April 2002, and Ms. Farris referred C. to the GEIT team. (Id.) C.K. testified that he asked if an IEP could be written for C., but he was told, "Well, that's like if it's really, really bad, and you don't want your child having the stigma of Special Ed." (AR Vol. V 470-471.) Instead, school officials encouraged C.K. to try a GEIT plan, and he trusted them, because they knew more about the subject than he did. (AR Vol. V 471.)

On September 9, 2002, C. was observed in his math class by Ms. Farris. (SAR 71.) She noted on the direct observation form that C. was very much engaged in the lesson, he sat with his knees up in the chair and was "somewhat fidgety but still attending to lesson, he volunteered often and answered questions correctly, and he read a book during 'down' time." (Id.) She calculated that C. was "on task" ninety-seven percent (97%) of the time while his peers were "on task" ninety-three percent (93%) of the time. (SAR 72.) Ms. Farris also noted that C. was able to ignore some inappropriate behavior of others. C. seemed very motivated and engaged in the lesson. (SAR 71.)

_____

[4]The form C.K. signed was not permission for special education testing; rather, it was permission for initial screening, and the school system believed this form did not start the 40-day clock for completing a student evaluation. (AR Vol. V 539, 542.)

8

C.'s classroom teacher filled out an "Indirect Observation" form.[5] (SAR 73.) She indicated she would like for C. to be more on task, more organized, and develop better written expression and verbalization of thoughts. She stated: "Does not attend to work in class–sometimes finishes or stops early and goes on to another 'chosen' activity." She also reported C. "[h]as great ideas and thoughts, but doesn't express them well in written form or verbally–needs organizational skills." She referred to the "Psycho-ed Eval," presumably the Bowie report, to note that C.'s achievement test scores were in the 82nd percentile for total reading, 78th percentile for total math, and 32nd percentile for language. To the question: "This student does not perform academically in the classroom in a manner that is commensurate with current academic standards?" the teacher checkmarked the box for "No."[6] She also indicated her awareness that C. was taking Adderall XR before school for ADHD. When asked, "Is the student's behavior affecting the education of the student?" the teacher checkmarked the box, "Yes." She also added the comment, "not attending to work being done[,] lack of organization." As for strengths and positive qualities, she listed "intense reader," "understands concepts quickly," and "higher order thinking." (SAR 73.) In a separate form entitled, "Behavior Concerns," Ms. Merrill noted the disability was ADHD and checked boxes indicating that C. occasionally ignored teacher directions, occasionally became upset when frustrated, and occasionally had sudden mood changes. (SAR 75.)

---

[5]Although the Court is not sure, the Court believes this person was J. Merrill, based on another form completed about the same time. (SAR 75.)

[6]Due to the use of a double negative in the question, the Court is not certain whether the teacher's answer meant that C. was or that he was not performing commensurate with current academic standards.

The GEIT team met on September 12, 2002, and drafted a GEIT plan. (SAR 76.) C.'s parents attended the meeting, as did Ms. Farris and Ms. Merrill; Marva Nettles, a "gifted" consultant; the school psychologist; and at least four other school staff members. The issues were defined as: "1) Changing classes 2) attention for ADHD 3) review testing and 4) organization problems." The interventions listed on the plan included: "1) Use printing instead of cursive 2) Homework assignments on computer 3) Teacher & parent will check agenda daily for HW assignments 4) Explain to [C.] the need to move to a "gifted" cluster classroom and give him some choice in the classroom decision 5) Sit close to teacher 6. Schedule his R.A. class with previous homeroom (Browning)."[7] To ascertain if these interventions were successful, the GEIT plan stated: "1) [C.] will continue his positive attitude 2) [C.'s] grades will reflect his ability 3) [C.] will successfully complete homework assignments." The GEIT plan also indicated that the school counselor would talk with C. about moving to another team, and the plan concluded with: "Do we need to consider Sp. ed. services for gifted, OHI, L.D.?"[8] (Id.) All of the GEIT team members, including C.'s parents, signed this plan.

A second GEIT team meeting was held in April 2003 attended by C.'s parents, Dr. Bowie, Ms. Nettles, three teachers, the school psychologist, and the school counselor and perhaps others. (SAR 91.) The GEIT plan written at that meeting indicated the issues were that Dr. Bowie did not feel C. was working to his potential, C. had some low grades, C. had difficulty with homework after

[7]The Court has been unable to locate any information in the administrative record confirming whether C. was moved to a "gifted" cluster classroom, and if so, what progress was made as a result.

[8]The Court believes OHI refers to Other Health Impaired and L.D. refers to learning disability.

10

his medication wore off, C. was still having difficulty with organization, and C. did not test well in science.  The plan also stated that C.'s parents were not unhappy with the situation, but they wanted C. to be successful in high school, to take advanced classes, and to match his performance level in school to his ability level.  The GEIT plan included as interventions that the parents would pursue outside counseling, directed studies would continue into the seventh grade year, C. would obtain after-school tutoring and assignments would be modified.  The plan noted that C. was then taking the medication Concerta.  C.K. signed this GEIT plan.

Following the April 2003 meeting, C.K. typed up a list of his concerns and presented it to the school.  (SAR 81.)  He wanted to know who would keep the school accountable on the interventions of the GEIT plan, what summer programs were available, what was the specific step-by-step process that would take place, who else was educated in ADHD/gifted that should be involved in planning for his son, and whether he should obtain a professional advocate.  In C.K.'s view, the same pattern was repeating itself in that the school system had started the school year well, but as the year went on, "somebody drop[ped] the ball."  (AR Vol. V 475.)  Because the end of sixth grade was nearing, C.K. did not want to wait three months, until the start of seventh grade, to move forward on an IEP for C.  C.K. wanted to schedule a certification meeting and an IEP meeting that would include Dr. Bowie, and he was trying to contact a local authority on ADHD/gifted, Dr. Martha Morelock.  He provided open dates on Dr. Bowie's schedule in June and July, and asked for a complete copy of C.'s file.

The GEIT team met on May 20, 2003.  The GEIT plan written that day recognized that C.K. was asking for an IEP-certification meeting, and stated that Dr. Bowie did not feel that re-testing was necessary.  C.K. reported to the team that he believed C. was capable of phenomenal work, but

11

that he was doing average work.  Dr. Martha Johnson, school psychologist, explained the state qualification standards, although the administrative record does not reveal what Dr. Johnson stated those state qualifications were.  She provided the GEIT team her interpretation of state regulations was that a student did not qualify as learning disabled as long as his achievement scores were within the average range.  The gifted consultant, Marva Nettles, expressed her view that C. did not have qualifying scores to be classified as intellectually gifted.  Dr. Johnson thought C. might qualify as "Other Health Impaired" and that C. had components of intellectually gifted, learning disabled, and Other Health Impaired.  The GEIT plan notes that C.K. wanted to move ahead with an IEP, and he wanted Dr. Bowie and Dr. Morelock to attend the IEP meeting.  Dr. Johnson discussed a section 504 plan, but C.K. again expressed his preference for an IEP.  Dr. Johnson indicated the team would look at special education certification.  The interventions written into the GEIT plan included an attention deficit evaluation of C. by the school psychologist, to include class observation and behavior scales; the parents' provision of C.'s medical certification for ADHD, vision and hearing screenings of C. by the school nurse, and C.'s attendance in a summer school math program.  The team agreed to meet again when the evaluation was complete, before the second week of the 2003-2004 school year.  C.K. signed this GEIT plan.  (SAR 113-114.)

In connection with the May 2003 GEIT team meeting, a form called Prior Written Notice, Notice of Meeting and Request for Consent was completed.  C.K. gave his permission to test C. to determine if he needed special education.  In addition, he granted permission to have C. undergo vision and hearing screenings and an ADHD assessment.  The form stated that the school considered continuing with the GEIT plan, but the GEIT team requested "ADHD evaluation before determining 504 or special education eligibility. [C.K.] believes GEIT plan has not been sufficiently formal."

12

(SAR 101.) The school had forty (40) days from the date of C.K.'s signature of consent to hold an eligibility meeting.[9] (AR Vol.V 207.) The form further provided that C.K. would take the medical certification for ADHD to C.'s pediatrician for completion and return it to the school with any previous ADHD assessment. C.K. signed a form called "Parent Rights" on May 20, 2003. (SAR 102-103.)

On May 25, 2003, C.'s parents provided the school with the Medically-Based Disability Certification form completed by C.'s pediatrician, Dr. Long. Based on an examination conducted on December 23, 2002, Dr. Long diagnosed C. as having ADHD. He stated C. was taking Concerta and provided the dosage. As to prognosis, Dr. Long wrote, "Good w/ resource teacher & med" and he recommended "resource assistance." (SAR 112.)

C.'s grades at the end of his sixth grade year were two Bs and two Cs. The Bs were in communication arts and social studies. The Cs were in science and math. (SAR 117.) C.'s numerical grade scores from quarter to quarter were not consistent, the lowest being a 67.60 in science in the first quarter.

On September 2, 2003, at the start of C.'s seventh grade year, C.K. signed a Prior Written Notice, Notice of Meeting and Request for Consent setting an IEP team meeting for the same day to determine if C. was eligible for special education and to decide whether to begin special education and related services. (SAR 118-121.) On the same day, C.K. received an Eligibility Report finding, "[b]ased on reports completed outside of school system & supplied by parent," that C. was not eligible for special education. C.K. signed the Eligibility Report and checked the box "Agree."

_____

[9]State monitoring of Williamson County School System files in 2005 found deficits in the school system's timeliness in completing evaluations. (AR Vol. V 541.)

13

(SAR 131.)   A GEIT plan written the same day, which C.K. did not sign, stated that C. did "not qualify for Sp. Ed./504" and "'It seems as if things we have put in place are working.'" Success would be defined by continuing to follow the regular seventh grade plan.  (SAR 130.)  The interventions included:  the parents would be sure C. was taking his medication, the parents and teachers would condition C. to take accelerated classes the next year, and the school would communicate daily with the parents as needed.  (Id.)  C.'s grades at the end of the seventh grade year were three Bs and one C.  The Bs were in math, science and communication arts.  The C was in social studies.  C.'s numerical scores over the year were again inconsistent, with the lowest being a 68.30 in math in the fourth quarter.  (SAR 134.)

At the beginning of the eighth grade year, C.'s new pediatrician, Dr. Michelle Fiscus, supplied the school with a Medically-Based Disability Certification form.  (SAR 135.)  She listed the diagnosis as ADD - inattentive predominant, and she reported she had prescribed the medication Strattera for C.  She noted C.'s prognosis was "Good," and, under "Recommended modifications of school program," she wrote "per IEP."  (Id.)

A GEIT followup meeting was held on August 14, 2004.  (SAR 137-141.)  C.'s parents presented another typewritten agenda.  They noted C. had already been qualified as needing an IEP because he was tested with a very high IQ and two doctors had certified him as having ADHD. They felt that, under the law, this qualified C. as eligible for special education.  They listed other areas of concern and requested a number of specific actions, including the development of an IEP. (SAR 140.)  Meeting notes indicate that C.K. felt the school had the best of intentions to help, but that C. was not getting the help he needed.  He reported that C. had negative feelings of inadequacy and frustration.  (SAR 137.)  The GEIT team noted that C. was taking medication and had tried

14

outside counseling, but it was not helpful. The team reviewed C.s achievement test scores and observed that he had made gains in three areas, but not in reading. Several times during the meeting C.K. pushed for an IEP. A team member stated after one request that "we don't know enough to write an IEP." (SAR 139.) C.K. insisted the team had been working on this a long time and "we should have an IEP." The school psychologist responded that testing would direct if C. needed an IEP and "we need to see how he learns." (Id.) Another team member pointed out that it had been decided an IEP was not necessary and C. did not qualify for one. C.K. replied: "We have been at this long enough. We have tried it your way for 2 years and at this time we would like an IEP. He does qualify now for an IEP and we would like to have one written today." (Id.) When asked what disability would be identified in the eligibility statement, C.K. answered, "ADHD." (Id.)

Noting that the Bowie report was three years old, the GEIT team agreed that another psycho-education evaluation conducted by the school would be appropriate. (SAR 137.) On August 24 through August 26, 2004, the evaluation was conducted by Kerry Hazenfield, the licensed school psychologist. (SAR 144-150.) This evaluation found C.'s full-scale IQ to be 121, lower than the full-scale IQ reported in the Bowie report by 22 points. In the Conclusions and Recommendations section of the evaluation report, the school psychologist wrote:

> [C.'s] academic achievement within the areas of reading, math, and written language were all found to be within the Average-to-Superior ranges, as assessed by the Woodcock-Johnson Tests of Achievement - Third Edition. [C.'s] academic achievement scores within the areas of Reading Comprehension, Math Calculation, and Math Reasoning were found to be commensurate with his assessed cognitive ability. His scores within the areas of Basic Reading and Written Expression were found to be lower than expected; however these score[s] are felt to be depressed due to [C.'s] fluency and not having complete sentences. In addition, [C.'s] cognitive processing skills were found to be adequately developed and commensurate with his ability.

(SAR 150.)

15

C.'s social/emotional behaviors and feelings were also evaluated. C.'s self-report form from the Behavior Assessment System for Children (BASC) indicated at-risk scores in the area of anxiety, but there were no endorsements within the clinically significant range. (SAR 149.) The parents' form resulted in scores in the clinically significant range in hyperactivity, depression, attention problems, social skills and leadership. The parents' form also resulted in scores in the at-risk range for aggression, anxiety and withdrawal. The teachers' forms resulted in scores in the at-risk to clinically significant range in the areas of attention, hyperactivity, withdrawal, social skills, and leadership. The school psychologist recommended that C.'s parents and teachers should closely monitor these noted behaviors of concern. The GEIT team was advised to review the evaluation results "in order to determine the best educational programming for this student, including the need for support services." (SAR 150.) The psychologist recommended consideration of peer mentoring, preferential seating, chunk assignments, tape recording lectures, use of printing or typing instead of cursive, access to spellcheck, dictionary and thesaurus, visual aids such as mapping, and project and essay plans developed with teacher and student. (Id.)

The GEIT team met again on August 30, 2004. (SAR 151-153.) The team observed the recent school evaluation revealed no significant learning disability, but some weakness in processing speed and written expression; therefore, C. did not qualify for special education as learning disabled. Moreover, C.'s full-scale IQ combined with his achievement test scores did not qualify him for special education as intellectually gifted. Further, C.'s creative thinking scores were not high enough to qualify him as intellectually gifted. (SAR 152.) After significant discussion, the GEIT team determined that C. was not eligible for special education services because his needs were being met in the general education curriculum. The GEIT team decided that C. should have a section 504

plan especially in light of his need for testing accommodations as he got into the "high stakes testing" on Gateway examinations in grades 8 through 10.[10] (SAR 153; AR Vol. V 585, 607-608.)

On August 30, 2004, an Eligibility Determination for Section 504 was completed, noting a "substantial" degree of impairment "across all subjects and increases as year progresses in school." (SAR 154.) The section 504 plan included the following accommodations: "1. Additional time for homework and testing (1 day extra for assignments without penalty); 2. Daily checkout with instructor for organizational support. 3. Provide incentives for completing all assignments. 4. Weekly contact with parent as needed." C.'s parents signed this Section 504 Accommodation Plan. (SAR 156.) Also on August 30, 2004, the parents were provided with a written list of Parent Rights under section 504. C.'s mother signed the form to indicate she had received it. (SAR 157-158.) Dr. Martha Johnson did not recall telling C.'s parents orally that, if they disagreed with the school's evaluation, they had a right to an independent evaluation. (AR Vol. V 580-581.)

The GEIT team held a meeting on November 30, 2004 for a section 504 review. During a discussion of C.'s low grades, C.K. indicated that C. should face consequences for not doing well and he should be required to re-do his poor work. C.K. wanted C. to improve his study skills to prepare for high school, and he stated the GEIT team had not found the method for C. to succeed. Other team members, including C.'s mother, expressed concern about putting too much pressure on C. C.K. indicated he was not so much concerned with grades as he was with C.'s motivation and

_____

[10]"Section 504" refers to the Rehabilitation Act of 1973, 20 U.S.C. § 794. Dr. Jonathan Ullrich, assistant principal at Heritage Middle School, explained his understanding that a section "504 plan in some respects carries more weight than an IEP in that then it's a Federal document that can be brought anywhere; an IEP is a district document." (AR Vol. VI 650.) C.K. wanted his son to have an IEP because it was more specific and he wanted more day-to-day accountability. (AR Vol. V 488, 491.)

whether C. was preparing himself for high school. C.K. stated he felt the system was failing his son. Team members raised the issue of whether C. was depressed, as his demeanor indicated that he was. The parents indicated C. had an appointment with his physician soon and they would address depression with her. Team members suggested strategies for C. that were the same or similar to ideas previously included in GEIT plans. (SAR 164-165.) Progress monitoring showed that, as of December 14, 2004, C. was passing all of his classes. By February 21, 2005, he had dropped a grade in science. By March 14, 2005, C. was failing science. (SAR 167.)

On February 28, 2005, the GEIT team met again. John McQuary, a counselor at Independence High School, attended. The parents reported the team still had not found a way to reach C.'s ability. They said C. needed something on a daily basis to "buy into," and they were concerned about who would check with C. daily in high school to keep him on task so he could achieve good grades for college entrance.[11] C. continued to have difficulty turning in assignments. Team members recognized that C. had a "complex profile," but they seemed to agree C. needed something in place to help him in high school. Mr. McQuary asked if an IEP would help. C.K. responded that his son did not qualify for special education as intellectually gifted, and other team members stated C.'s grades were fine, C. did not meet the criteria for intellectually gifted, and C. did not demonstrate a need for an IEP. Mr. McQuary said he would support an IEP so that C. would have someone check on him on a daily basis, because a student on a section 504 plan was "pretty

_____

[11]Dr. Ullrich testified he believed C.K. wanted higher grades and more services than C. wanted. (AR Vol. VI 655.) When asked, "Was dad wanting a program that was more of the Cadillac program and not something that would help [C.] have access to the General Education?" Dr. Ullrich replied, "You could say that." (Id. at 656.) Dr. Ullrich felt C. "absolutely" had access to the general curriculum and appeared successful in it. (Id.) He also conceded, however, that C.'s parents at times put in an immense amount of effort to get C. to do even the work necessary to achieve the grades he earned. (Id. at 669.)

much on his own" in high school. The school psychologist was concerned how C. would perceive himself if he became a special education student. Mr. McQuary responded that high school special education teachers had a daily study hall where they checked in with their students, and on a section 504 plan, this may not happen.[12] The school psychologist reported that her assessment of C. for depression had shown no significant evidence of depression. The team agreed to meet with high school teachers in May to put together a high school plan so it would be in place for the upcoming fall. (SAR 168-169.)

The section 504 plan remained in effect through the end of C.'s eighth grade year. At the end of that school year, C.'s grades were three Bs and two Cs. The Bs were in Algebra I, Language Arts, and American History. The Cs were in Spanish I and Science. (SAR 173.) Algebra I and Spanish I were typically ninth grade classes. (AR Vol. VI 668.) It is not clear whether the GEIT team met with high school teachers in May 2005 to devise a high school plan.

In August 2005, when C. started his freshman year at Independence High School, C. told his school counselor, Shawn Carter, and his father that he wanted to be responsible for his own work and he did not want his parents looking over his shoulder. Ms. Carter called C.K. about setting up a team meeting, but C.K. agreed to allow C. to see what he could do on his own working directly with Ms. Carter. (AR Vol. V 524-525.) By December 2005, C.'s grades were falling, evidencing the return of the same pattern, and C.K. requested a meeting. (Id. at 525-526.) Although C.'s grades in the second quarter were three Bs and two Cs, C.K. stated the grades did not "show the struggle." (Id. at 526.)

_____

[12]High school principal Marilyn Webb disputed Mr. McQuary's remarks. She did not agree that a section 504 student would be on his or her own, and she stated the accommodations listed in a section 504 plan would be taken seriously and implemented. (AR Vol. VII 816-817.)

19

On December 1, 2005, a section 504 meeting was held, and a new section 504 plan was written. (SAR 175-176.) The accommodations included were: "1. [C.] will get his teachers and parents to sign agenda daily. 2. [C.] will attend after school tutoring. 3. IHS staff are to contact parent(s) when [C.] is struggling academically or behaviorally." (SAR 179.) The third accommodation was put in the plan because Ms. Mabry brought up the fact that C. had been awakened in class. C.K. signed this plan. (Id. at 179.) C.'s mother signed a "Parent Rights" form. (SAR 182-183.) At the end of first semester, C. earned three Bs and three Cs. The Bs were in English I, Lifetime Wellness, and Theatre Arts I. The Cs were in Geometry, Physical Science Honors and Spanish II. (SAR 192.)

On January 11, 2006, C. was involved in a fight with another student in eighth period study hall very near the end of the school day. The study hall teacher reported to an assistant school principal, Brian Ferguson, that C. had struck another student while both were in their seats. (AR Vol. VII 826.) The next morning, Mr. Ferguson interviewed the other student and then C. The two students reported they had an argument related to an ongoing disagreement and they called each other names. (SAR 201, 203.) In a written statement, C. admitted he "smacked" the other student in the face twice and "jabbed" him in the face once (described as a "punch" by Mr. Ferguson). Mr. Ferguson also obtained student witness statements (SAR 202, 204) and then consulted with another assistant principal and the principal, Dr. Webb, about possible consequences.

Mr. Ferguson then contacted C.K. to inform him that C. would be suspended from the regular classroom for twenty (20) days and placed in the Alternative Learning Center due to the assault, which was a "zero tolerance" offense under school policy. Mr. Ferguson requested a meeting with C.K. (Id. at 826-830; SAR 200.) C.K. went to the school that day to meet with Mr. Ferguson. C.K.

20

wanted to know why C. would be punished this way and he was concerned that no one from the school had called him about C.'s behavior problem as required under the section 504 plan. (AR Vol. V 528.) C.K. stated a 20-day suspension at the Alternative Learning Center was not acceptable and he wanted Mr. Ferguson to find an alternative that would keep C. in school. (SAR 195.) Because C. was on a section 504 plan, a manifestation hearing was set for January 13, 2006, so the team could determine if C.'s behavior was a manifestation of his disability. (SAR 200, 205-206.)

The manifestation hearing was attended by Dr. Webb, Mr. Ferguson, C.K., C., Ms. Carter, Katie Berger, a teacher, and Janet Anthony, school psychologist, on Friday, January 13, 2006.[13] During the discussion, team members observed that C. was making academic progress, but there were concerns that the section 504 plan should be revised to add specifics regarding who was responsible for each component. The manifestation hearing ended due to a shortage of time and conflicts regarding the determination. (SAR 209.) The question arose whether C. had taken his medication during the holiday break and whether that impacted his behavior. Ms. Anthony agreed to contact C.'s physician to determine the ramifications of missing ADHD medication.

The manifestation meeting reconvened on January 20, 2006, and in addition to the prior participants, a staff attorney for the school was present. (SAR 217.) The issue was raised whether C. continued to be eligible for a section 504 plan. Ms. Anthony reported that Dr. Fiscus told her C. had ADHD, inattentive type, and the medication Strattera was prescribed for inattention. Dr. Fiscus was concerned that C. was allowed to go off his medication during Christmas break, but she would not support the statement that, because C. did not take his medication, the fight occurred. (SAR 213.)

---

[13]The Court notes that certain pages pertinent to this discussion and cited in the Board's brief (Docket Entry No. 56 at 6), pages 208 and 211-212, are missing from the hard copy of the supplemental administrative record submitted to the Court.

Ms. Anthony reported she had spoken to C. that week about coping mechanisms to use when he is annoyed by people around him, and she wanted to work with him in the future on strategies. The team agreed to revise the section 504 plan to include elements discussed at the meeting. (SAR 214.) C. was asked to give his side of the story and he admitted he struck the other student, demonstrating how he had done so. (SAR 214-215.) When asked if his conduct was acceptable behavior for high school, C. answered, "No, probably not." (SAR 215.) C.K. said that, if the discipline could be mitigated he would have no problem stating that the event was not a manifestation. (SAR 216.) The team concluded that C.'s behavior was not a manifestation of a disability. (SAR 217.)

C.'s parents filed an appeal of the disciplinary decision.[14] (SAR 199, 220-221, 223.) Ultimately, the Disciplinary Hearing Authority changed C.'s discipline to twenty (20) days of in-school suspension, to be served between January 12 and February 10, 2006. (SAR 198.) C.K. still felt this was a change in placement, and he held his son out of school five (5) days while he asked Dr. Webb as principal to exercise her authority to ameliorate the punishment. (SAR 219, 247; AR Vol. V. 530-531.) Thereafter, C.'s parents retained an attorney.

On January 30, 3006, through the attorney, C.K. requested an expedited due process hearing on the manifestation determination, claiming that he had not been provided the opportunity to disagree in writing at the meeting and he was not provided the opportunity for meaningful input. (AR Vol. III 315.) C.K. asserted that C. had already served eleven (11) days out of his regular educational placement, C.K. felt the continued suspension was detrimental to C., and C.K. would not return C. to school "until this discrimination is stopped." (Id.) C.K. claimed that the

---

[14]The Court's copy of the supplemental administrative record is also missing pages 224 to 226.

discrimination against C.'s rights and his punishment of an out-of-classroom placement for such a lengthy period of time was a denial of FAPE, was not providing C. an appropriate education in the least restrictive environment, and was a violation of section 504. (Id.)

On March 8, 2006, the parents' attorney sent a letter to the school district superintendent requesting that C. be evaluated again, that a functional behavior assessment be conducted, and that a behavior intervention plan be developed. (AR Vol. VI 684-685; SAR Ex. 4.) The team held a section 504 meeting in early April 2006. In preparation for the meeting, Ms. Anthony provided written surveys to four of C.'s teachers regarding behavioral concerns. The team reviewed these surveys and concluded that C. was not having any behavioral problems other than the one fighting incident. (AR Vol. VI 686.) The team was in agreement that a behavior plan was not appropriate at that time, but C. should be evaluated for emotional behavior/depression. (Id. at 687.)

Ms. Anthony informed C.K. she had concerns about doing another IQ test for C. because he had had one the previous year and it was not the practice of most psychologists to repeat the test within a year. (AR Vol. VI 685-686, 690-691.) C.K. expressed concern about C.'s depression, which was troubling also to Ms. Anthony. (AR Vol. VI 714.) She agreed to submit some behavior rating tests (a BASC) to the parents, teachers, and C., to determine if C. was suffering from any depression or other behavioral issues. (AR Vol. VI 686.) The team and C.K. agreed to this evaluation. (Id. at 687.) The behavior rating scales were completed in May 2006. (Id. at 688.) Ms. Anthony reported that none of the scores gave rise to any significant concerns about depression or other psychological problems with C. in the school setting. The teacher rating scales, with the exception of one completed by the English teacher, did not give any indication that C.'s inattention

23

significantly interfered with his education such that he should be identified as "Other Health Impaired" for special education purposes.  (SAR 234-240; AR Vol. V 610, 616.)

At the end of his freshman year, C. earned one A, three Bs, and two Cs.  The A was in Lifetime Wellness.  The Bs were in English I, Geometry, and Theatre Arts I.  The Cs were in Physical Science Honors and Spanish II.  (SAR 232.)  During the year, however, C. received five (5) Fs.  These were in first and third quarter Physical Science Honors, an advanced class; the first and second semester exams in Spanish II, an advanced class; and the second quarter in Theatre Arts I.  (Id.; AR Vol. VI 693, 712-713.)  The advanced classes were above C.'s grade level.  (Id.)  C. also earned ten (10) As over the course of the year.  (SAR 232.)  ADHD students tend to have problems being consistent.  (AR Vol. VI 729.)

On June 21, 2006, C.K. amended the administrative appeal complaint to include an IDEA claim of failure to identify C. as a student who was eligible for special education and therefore, C. was denied a free appropriate public education ("FAPE").  The parties agreed to consolidate the due process hearing on the section 504 manifestation issue with the hearing on the IDEA claim.  (AR Vol. III 271, 277, 315-316.)

Prior to the administrative hearing, the Board filed a motion in limine seeking to exclude any evidence related to the findings of the Disciplinary Hearing Authority because the special education due process hearing was not the proper jurisdiction for such appeals.  (AR Vol. III 208-210.)  The Board also filed a motion in limine seeking to exclude any procedural violations alleged prior to January 2004 as barred by the statute of limitations under 20 U.S.C. § 1415(f)(3)(C).  (AR Vol. III 213-214.)  The Administrative Law Judge ("ALJ") took the motions under advisement at the start of the hearing.  (AR Vol. IV 330-332.)

C.K. modified the relief requested as the case unfolded. In C.K.'s first complaint, he sought (1) C.'s immediate return to regular placement with a tutor to assist in all work missed; (2) a § 504 meeting to hold a manifestation determination of the offending behavior; and (3) training of school administrators as to the rights required when disciplining § 504 students. The Board contended that the first two requests were moot and the third request is not a remedy available under § 504. In an amended complaint, C.K. sought: (1) immediate testing of C.; (2) an IEP meeting to design an appropriate IEP for the next school year and 3) compensatory education for the denial of FAPE. (AR Vol. III. 260.) In his Pre-Hearing Conference Questionnaire, C.K. requested the following relief:

(1) compensatory education for the denial of FAPE for two years including the time in ISS; (2) correction of C.'s permanent record to remove the unexcused absences for any time missed when assigned to ISS; (3) training of WCS staff regarding the appropriate measures and time lines for identifying and testing students for special education and § 504 as well as discipline of such students; (4) identification of C. as Other Health Impaired based on his medical eligibility of ADHD; and (5) further testing by an independent evaluator to determine whether C. is gifted and/or learning disabled. (AR Vol. III 253.) At the hearing, C.K. asked that C. be identified as needing an IEP for Other Health Impairment at a minimum, further testing to be sure an issue remained on intellectual giftedness or learning disability, an appropriate IEP to allow C. to make up for some of his lost time, and compensatory education with counseling to help him improve his self-image from having not been successful in school. (AR Vol. IV 335.)

At the administrative hearing, among other witnesses, C.K. called an expert witness to testify. Dr. Shawn Stewart is a licensed psychologist in private practice with extensive experience

in Tennessee schools, including development of student IEPs. (AR Vol. IV 338-342, Ex. 1.) Dr. Stewart characterized the Bowie Reading and Learning Center as the "gold standard" for student evaluation in the State of Tennessee. (<u>Id.</u> at 347.) Dr. Stewart believed that C.'s higher full-scale IQ as reported in the Bowie Center evaluation was the more accurate assessment of C.'s intellectual ability, rather than the lower IQ score obtained during the school's testing. (<u>Id.</u> at 351-352.) Dr. Stewart also agreed with the Bowie report that C. was learning disabled in writing skills and math because of the discrepancy between C.'s predicted scores as compared to his intelligence. (<u>Id.</u> at 358.) C. was not performing at the highest standards academically, but he was not performing at the lowest standards, either, and he struggled in certain areas. (<u>Id.</u> at 365.) Given C.'s IQ, Dr. Stewart felt there was a discrepancy between C.'s level of potential achievement and what he was actually achieving, and for this reason he believed that C. met the State Department of Education's definition of "Other Health Impairment." (<u>Id.</u> at 365-366, 374-377.) In the ten years Dr. Stewart had been helping people identify and make decisions about students' "other health impairment," Dr. Stewart had always considered grades *not* to be the standard. (<u>Id.</u> at 378.) Moreover, it is important to look at how the student is performing in each class; not at the end-of-year grade point average. (<u>Id.</u> at 380.)

Given the whole picture, where C.'s attention problems brought his achievement down and his intelligence brought his abilities up, C. would be expected to be in the middle academically. But, Dr. Stewart opined that did not mean C. did not meet the prong of significant impact:

> If we deal with the ADD and we give him resources to help with his giftedness, he should be able to achieve at a significantly high level. I mean, this is a brilliant child by any standards, by any of the reports that we have. If you take the lowest of all possible scores across the board, he's still an academically gifted student.

Case 3:07-cv-00826   Document 58   Filed 02/27/09   Page 26 of 38 PageID #: 524

And so if that's the case, then we would presume that he needs to be performing at the top level with other top performing students.

(Id. at 366.)  C.'s grades confirmed this was not the case.  (Id.)  Having met C. on multiple occasions, albeit not through direct classroom observation, Dr. Stewart perceived C. as

a student who has struggled academically and shows the psychological impact of that struggle.  He doubts his academic prowess.  He's concerned.  He doesn't feel that he's as smart as he is.  He doesn't feel that he can achieve at the level that I would hope him to achieve.  He doubts that.

(Id. at 367, 414.)

If Dr. Stewart had been a member of the GEIT team when C. started sixth grade, in view of the Bowie report and other documentation, he would have recommended that C. be certified as a child with a disability due to the complex nature of the interactive effects of multiple certifications: Other Health Impairment, ADD, ADHD, gifted and potential learning disability.  (Id. at 359-361.) Further, because the assessments used by the Bowie Center were consistent with what the schools in Tennessee were using at the time, he would have recommended that the GEIT team accept the results and recommendation of the Bowie report or conduct followup-assessments to answer any questions that might remain, if necessary.  (Id. at 360-361.)  Dr. Stewart felt an IEP along the lines of the numerous recommendations made in the Bowie report could have helped the school assist C. in gaining academic success so C. could feel his intellectual abilities.  (Id. at 368-369, 389-390.)

Dr. Stewart also testified about the differences between ADD and ADHD, and explained that a student with ADHD-inattentive type is still prone to impulsive behavior.  (Id. at 381-384.) Students who struggle with either ADD or ADHD are apt to act impulsively because of reaction time.  Brain activity is so fast that the cognitive process to delay decision-making–the amount of time between the thought and the act–does not occur quickly enough and impulsive acts or words

27

follow. (Id. at 385.)  Further, Dr. Stewart believed C. suffered from some depression.  The primary

feature of depression in a male adolescent is an increase in aggression and anger.  Frustration would

also contribute to aggression.  (Id. at 387.)  For these reasons, Dr. Stewart would have found that

C.'s fight with another student was impulsive by nature and a manifestation of his ADHD.  (Id. at

388.)  Because C.'s section 504 plan was "the most basic intervention that's probably possible[]"

and lacked interventions to deal with the impulsive nature of C.'s disability, Dr. Stewart also felt that

C.'s conduct was a direct result of the school's failure to implement an IEP.  (Id. at 389.)

Dr. Johnson disagreed with Dr. Stewart's view that a child with ADHD-inattentive type who

fought with another student could be said to act impulsively; rather, she believed the student made

a bad choice.  (AR Vol. V 608-609.)  Further, Ms. Anthony testified that, even if C. had had an IEP,

it would not have included a behavioral component, and thus C.'s conduct would not have been a

direct result of the school's failure to implement the IEP.  (AR Vol. VI 717.)  Three of C.'s teachers

testified that C. was able to benefit from the general education curriculum without an IEP.  (AR Vol.

VI 739-796.)

C.K. testified he felt it would be helpful if Dr. Stewart were a member of C.'s IEP team.  (AR

Vol. V 512.)  He also stated that he signed pieces of paper, including parents' rights forms, without

reading them.  (Id. at 522.)


### III.  DECISION OF THE ADMINISTRATIVE LAW JUDGE

The ALJ found that the Bowie report and the Metropolitan Nashville Schools special

education screening provided to Heritage Middle School by the parents at the beginning of C.'s sixth

grade year should have placed the school on notice of C.'s eligibility for special education, but school officials failed to follow the proper process to determine if C. was eligible for special education. (AR Vol. I 4-28.) The ALJ also ruled that the school should have been on notice of C.'s potential eligibility for special education at the end of the sixth grade when C.'s parents again asked for an IEP meeting to be attended by Dr. Bowie. The ALJ found that, based on C.'s difficulty with educational performance, documented as early as the third grade, in conjunction with the physicians' diagnoses of ADHD, C. was eligible and qualified for certification as Other Health Impaired. The ALJ further found that C. remained eligible for special education in September 2004, two years after the schools' receipt of appropriate testing and evaluation reports and a proper request for evaluation by C.'s parents.

The ALJ determined that procedural violations under the IDEA occurred when: (1) the Board failed to identify and evaluate C. for special education services no later than the beginning of seventh grade; (2) the Board failed to develop an IEP for C.; and (3) the Board failed to provide C.'s parents with notification of their procedural due process rights. The ALJ also found that the school erred when it relied on C.'s test scores and progression from grade to grade to deny special education services when the proper analysis should have been whether C. needed special services education to benefit from the general curriculum. According to the ALJ, the school also erred when it developed a section 504 plan only to prepare for "high stakes testing" and not for C.'s daily assistance in the classroom, and by not implementing the existing section 504 plan at the beginning of ninth grade whether C.K. wanted the plan implemented at that time or not.

The ALJ credited the testimony of Dr. Stewart that C. should have been certified for special education as Other Health Impaired, learning disabled, and intellectually gifted. Also relying on

the testimony of Dr. Stewart, the ALJ held that, due to the failure to identify C. as a student in need of special education and the failure to develop an appropriate IEP for C., the manifestation hearing resulted in an incorrect decision. The ALJ concluded that C.'s fighting conduct was impulsive behavior caused by his ADHD, and C. should have been returned to his placement with proper modifications in the IEP, including a behavioral component, rather than face discipline during in-school suspension.

The ALJ ordered the Board to develop an appropriate IEP for C. within sixty (60) days, including an appropriate program of positive behavior supports. The ALJ also ordered the Board to retain Dr. Stewart as a member of C.'s IEP team. In addition, the ALJ ordered the Board to provide one year of compensatory services to C. in the form of tutoring before and/or after school as determined by the IEP team. The ALJ also provided that the IEP team "shall determine from a range of 1-3 hours per week for a school year for the compensatory services." Finally, the ALJ ordered that any reference in C.'s disciplinary file to the fighting incident and any punishment imposed must be expunged; however, the ALJ did not require amendment of the attendance record for those days C.K. kept his son at home while disputing the in-school suspension.

## IV. CONCLUSIONS OF LAW

The IDEA requires a state to provide a "free appropriate public education" to all disabled children within its jurisdiction as a condition for receiving federal funds. Doe v. Board of Educ., 9 F.3d 455, 459 (6th Cir. 1993). A free appropriate public education consists of education instruction specially designed to meet the unique needs of the disabled child, supported by such services as are necessary to permit the child to benefit from the instruction. Nack ex rel. Nack v. Orange City School Dist., 454 F.3d 604, 608 (6th Cir. 2006). "The Act provides no more than a

30

"'basic floor of opportunity . . . consist[ing] of access to specialized institutions and related services which are individually designed to provide educational benefit'" to the disabled child. Doe, 9 F.3d at 459 (quoting Board of Educ. v. Rowley, 458 U.S. 176, 201 (1982)).

The ALJ found on the evidence that C. suffers from ADHD and that the condition had been diagnosed by the time he entered Heritage Middle School as a sixth grader. In fact, the Board agrees that C. has such a disability. The Board contends, however, that the ALJ erred in ruling that C. qualified as Other Health Impaired, learning disabled, and intellectually gifted and that C. needed specially designed instruction to benefit from the general education curriculum, relying on Scottsdale Unified Sch. Dist., 38 IDELR 137 (Docket Entry No. 56-2, Ex. B.) The Board contends now, as its witnesses did before the ALJ, that C. did not meet the State of Tennessee standards for Other Health Impaired, learning disabled, or intellectually gifted and therefore, it was appropriate to provide him with section 504 accommodations, but not special education.

Under Scottsdale Unified Sch. Dist., the Board "has the burden of proving that the evaluation(s) supporting eligibility are inappropriate." (Docket Entry No. 56-2 at 14.) Thus, the Board had the burden to prove to the ALJ that the Bowie report supporting a finding of C.'s eligibility for special education was not appropriate.

The Court did not locate any documentation presented at the due process hearing by the Board that specifically outlined for the ALJ (and now this Court) the particular state standards at issue, C.'s pertinent test scores, grades and other indicia of performance in relation to those state standards, and an explanation of why C.'s scores and grades did not meet those state standards. The administrative record included a blank copy of the state's form, "Documentation – Component Gifted Assessment" (SAR 242-243), which contains the standards to be used in assessing students

31

for giftedness. Another blank copy of the form was provided to the Court on appeal. (Docket Entry No. 56-1, Ex. A.) Without an understanding of how C.'s test scores fit into this matrix, the blank copy of the form is not particularly helpful.

At the due process hearing the school's witnesses testified generally that C. did not meet the standards, but C.K.'s expert witness, Dr. Shawn Stewart, testified that C. did meet the standards based on the findings of the Bowie report. Dr. Stewart described the Bowie report as the "gold" standard in Tennessee, and he explained at length why school officials, upon receiving a copy of the Bowie report on C.'s entrance into the sixth grade, should have immediately considered C. for special education *or* school officials rationally should have explained why the Bowie report did not qualify C. for special education *or* school officials should have undertaken their own evaluation if necessary to explain why the Bowie report would not be followed. Had he been a member of the GEIT team, Dr. Stewart would have recommended that C. be certified as a child with a disability due to the complex nature of the interactive effects of multiple certifications: Other Health Impairment, ADD, ADHD, gifted and learning disability. Instead, purporting to rely on the Bowie report, the school proceeded through several GEIT plans offering minimal interventions for C. until August 2004 when the Bowie report was three years old and the school decided to conduct its own evaluation. Even then, the school refused special education services and offered a section 504 plan that was not substantially different from the GEIT plans that preceded it.

Faced with conflicting testimony by the school's educators and C.K.'s expert about whether C. qualified for special education, the ALJ expressly credited Dr. Stewart's testimony over the school witnesses who testified that C. did not need specially designed instruction to have access to, and benefit from, the general education curriculum. Similarly, the ALJ credited the testimony of

32

high school counselor, Mr. McQuary, who suggested during a section 504 meeting during C.'s eighth grade year that an IEP would be preferable, if not necessary, for high school. While the school's witnesses tried to discredit Mr. McQuary's statement during the due process hearing, the ALJ expressly chose to rely on Mr. McQuary's remark as credible over the attempts made by the school system to discredit it.

These credibility determinations of the ALJ are entitled to deference and due weight by this Court, particularly because educational expertise is required to determine what educational standards apply and whether such standards were met. In addition to these credibility determinations, the ALJ noted that other evidence showed C.'s disability of ADHD adversely affected his educational performance. C.'s academic performance remained inconsistent from quarter to quarter, with grades ranging from Fs to As, and his academic achievement suffered. Under the law, it is not enough that C. managed to earn average to above average grades overall by the end of each school year in order to advance to the next grade level. Each state "must ensure that FAPE is available to any individual child with a disability who needs special education and related services, even though the child has not failed or been retained in a course or grade, and is advancing from grade to grade." 34 C.F.R. § 300.101(c)(1) (2007) (formerly found in 34 C.F.R. § 300.121 (2002-2006)). Observing that the school "has clearly misapplied or ignored 34 C.F.R. 300.101" (AR 25), the ALJ concluded that the school system's delay in identifying C. as a student with a disability who was in need of special education to benefit from the general education curriculum and the school's refusal to convene an IEP meeting to draft an IEP as requested repeatedly by C.K. were procedural violations of the IDEA.

The Court affirms that conclusion. See Board of Educ. v. L.M., 478 F.3d 307, 313 (6th Cir. 2007) (holding claimant must show school officials overlooked clear signs of disability and were

33

negligent in failing to order testing, or that there was no rational justification for not deciding to evaluate). The IDEA did not require the school to maximize C.'s potential or provide the best possible education for him at public expense. <u>Nack</u>, 454 F.3d at 613. The statute only required the public school to provide sufficient specialized services so that C. could benefit from his education. <u>Id.</u> However, the school must provide educational benefits that are more than *de minimis* in order to be "appropriate." <u>Doe</u>, 9 F.3d at 459.

A procedural violation must cause substantive harm to the child or his parents. <u>Knable</u>, 238 F.3d at 764. Only if the Court finds that a procedural violation resulted in substantive harm and constituted a denial of C.'s right to FAPE, may the Court grant such relief as the Court determines is appropriate. <u>Id.</u> Having met with C. on more than one occasion, Dr. Stewart testified about the substantive harm caused by the school system's procedural violations. He explained that C.'s academic struggle had caused a psychological impact. C. doubted his academic "prowess" and he did not feel he is as smart as he is or that he can achieve at a level expected for a student of his intellectual ability. According to Dr. Stewart, providing C. with special education pursuant to an IEP likely would have avoided much of this harm. Like the ALJ who credited this testimony, the Court concludes that the procedural violations of the school system caused substantive harm to C.

The ALJ's ultimate determination that the school failed to provide C.'s parents with their due process rights is not consistent with another finding made by the ALJ on the evidence. The ALJ specifically found that C.K. "knew his rights and received his rights throughout his interactions with Williamson County Schools." (AR 22.) The Court finds that the record evidence supports this statement. C.'s parents were repeatedly informed of their due process rights and they signed forms indicating they had received such rights. Thus, it makes no sense for the ALJ to list as a procedural

34

violation the school's "failure to provide the parents with procedural due process rights when services are denied." (AR 26.) The Court will reverse this finding by the ALJ because it is not supported by the evidence.

Next, the ALJ concluded that C.'s fighting behavior was a manifestation of his ADHD, even though the team determined the altercation and classroom fight were not a manifestation or proximate result of C.'s ADHD inattentive type. This finding, of course, was predicated on the ALJ's earlier determination that C. qualified for special education, a conclusion this Court upheld. Because C. did not have an IEP as he should have, the ALJ found that the lack of an IEP necessarily superseded the manifestation decision. Although Dr. Fiscus, C.'s treating physician, reported that C.'s ADHD was inattentive-type, she stated C. needed an IEP at the time of the altercation. The ALJ credited Dr. Stewart's testimony that an inattentive-type ADHD student is still prone to impulsive behavior. He testified at the hearing before the ALJ that a student with ADHD, inattentive type, follows the same pattern as an ADD student in that both are apt to act before thinking about the decision or the consequences. The cognitive process is not followed before the action taken, which results in impulsive behavior without forethought. He concluded that in his opinion C. did act impulsively as a manifestation of his ADHD when he slapped and punched the other student during a verbal argument in the classroom on January 11, 2006. The ALJ's decision to credit Dr. Stewart's testimony on this point is supported by other information in the record. School officials knew prior to the incident that C. was at-risk for aggression, even though no behavioral intervention plan had been designed. Because the ALJ's determination on the manifestation issue is adequately supported by the record, the Court will not reverse it.

Finally, the Board disputes the relief ordered by the ALJ, specifically those portions of the ALJ's order requiring that Dr. Stewart serve as a member of C.'s IEP team and requiring expungement of C.'s disciplinary record. The Board contends that the ALJ relied for authority to impose these forms of relief on 20 U.S.C. § 1415(i)(2)(C) ("In any [civil] action brought under this paragraph, the court– . . . .(iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate."). However, the Board argues that the statute by its express terms is directed to the power of the federal court to grant relief on appeal and not to the ALJ's power to fashion relief in the first instance, and this Court agrees. C.K. relies on Tenn. Code Ann. § 49-10-601(f)(2) as the source of the ALJ's authority, contending that statute concerning special education appeal and review rights states that "the hearing officer . . . shall have authority to affirm, reverse or modify the action previously taken and to order the taking of appropriate action." The Board responds that this subsection of the statute must be read in harmony with other provisions of the statute and when so read does not permit an ALJ to impose the type of relief required here.

The Court need not decide this dispute about the meaning of a state statute in order to resolve this case. Section § 1415(i)(2)(C) grants this Court authority to determine "such relief as the court determines is appropriate." The Court determines that all of the forms of relief ordered by the ALJ are appropriate in this case, except that the Court finds the Board should not be required to retain Dr. Stewart to serve as a member of C.'s IEP team. Counsel for the Board filed an affidavit in this case on October 23, 2007 detailing attempts made to contact Dr. Stewart to invite him to an IEP meeting as ordered by the ALJ and the numerous unsuccessful attempts to contact Dr. Stewart. (Docket Entry No. 27, Ex. A, Bergeron Aff.) The affidavit revealed that Dr. Stewart's business

36

telephone was not functional, electronic correspondence sent to Dr. Stewart's email address was returned as undeliverable, and Dr. Stewart did not respond to counsel's voicemail messages or mail correspondence. Under these circumstances, the Court will not require the Board to make any further attempts to retain Dr. Stewart to serve on C.'s IEP team.

The Board also takes issue with the ALJ's decision to order expungement of C.'s disciplinary record. The Board accurately points out that the ALJ first observed the disciplinary procedure was not part of the section 504 or IDEA processes (AR 16), yet, the ALJ later ordered the Board to expunge from C.'s record any reference to the fighting incident and the punishment imposed. The Court finds there is some authority for expunging a student's disciplinary record where there has been a section 504 violation, see e.g., Jonathan G. v. Caddo Parish Sch. Bd., 875 F.Supp. 352, 364 (W.D. La. 1994), and for this reason, the Court affirms the ALJ's decision to order expungement in this case. Thus, except for requiring Dr. Stewart to join the IEP team and the Court's rejection of the ALJ's finding that the school did not provide the parents with their procedural due process rights, the ALJ's relief order shall remain in full force and effect in all other respects.

## V. CONCLUSION

For all of the reasons stated, the decision of the ALJ will be affirmed in part and reversed in part. C. is eligible for special education, and the Board's failure to identify C. as a special education student promptly and to draft an appropriate IEP are procedural violations of the IDEA that caused substantive harm to C. The Court concludes that C.'s parents were provided their due process rights at all relevant times and thus, there is no basis to find a procedural violation of the IDEA based on a lack of due process. All forms of relief ordered by the ALJ shall remain in effect, except for that provision requiring the Board to include Dr. Stewart as a member of C.'s IEP team

37

An appropriate Order shall be entered.

ROBERT L. ECHOLS
UNITED STATES DISTRICT JUDGE

Case 3:07-cv-00826   Document 58   Filed 02/27/09   Page 38 of 38 PageID #: 536